## Robertson v. Commonwealth.

(Decided Oct. 14, 1938.)

WILLIAMS & DENNY for appellant.

HUBERT MEREDITH, Attorney General, and JOHN M. CAMP-BELL, Asssitant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

The appellant, Eddie Robertson, having been indicted by the grand jury of the Rockcastle circuit court at its August, 1937, term, charging him with the murder of Arthur Mullins, was upon his trial therefor found guilty, as charged, and his punishment fixed at life imprisonment.

Briefly summarized, the commonwealth's evidence clearly established that shortly after noon of April 15, 1937, the accused, Eddie Robertson, was walking down one of the main streets of Mt. Vernon, Rockcastle county, Kentucky, and had reached the business section of the town, where there were some forty or fifty people standing around, when he met the deceased as he walked up the street, unaware of the presence of the accused; that as the deceased passed him, the accused, without any apparent provocation, suddenly reached out with his left arm, grabbed the deceased and pressed him to him, as with his right hand he drew his gun and shot and killed him.

This homicide occurred in the public view of these forty or fifty people standing nearby in the street, several of whom were eyewitnesses of the killing and who testified upon the trial to such being the facts and circumstances under which it occurred.

One of the commonwealth's witnesses, Johnnie

Lakes, a marshal of the town of Livingston and a friend of the defendant, who lived near there, stated that he was with the defendant all during the day on which this homicide occurred, had lunch with him and shortly thereafter again met the defendant and had a conversation with him (some fifteen or twenty minutes before he killed the deceased), when he inquired of witness as to where the deceased then was, to which he answered that he did not know; that the defendant then said, "I want to see him and talk with him; he' thinks I am mad at him and I am not." Further he testified that he thought Robertson at the time was under the influence of liquor.

Also, the commonwealth witness, Millard Doan, a deputy sheriff of Rockcastle county, who was nearby at the time of the shooting and arrested the defendant, testified that while he couldn't say that the defendant was drunk, he could smell liquor on him and that he was drinking.

Another commonwealth witness, Albert Mullins, testified that the defendant had a son, Willie Robertson, who had been indicted and twice tried on a highway robbery charge, at the January and April, 1938, terms of the Rockcastle circuit court; that upon the first trial the deceased had testified as an adverse character witness against the defendant's son; that thereafter, but some while before the occurrence of the homicide here involved, he and the defendant were talking together about what Arthur Mullins, the deceased, had sworn on that trial, when the defendant said, "A man that would say that his boy's character wasn't good and his wasn't any better than the boy's that he would get even with him"; also, that he had told several people about what the defendant had then said after Arthur Mullins was killed.

The defendant, when called to trial on the indictment charging him with the murder of the deceased, Arthur Mullins, entered a plea of not guilty, and thereunder sought to excuse his admitted killing of Mullins and avoid his responsibility therefor upon the ground that when the homicide was committed he was temporarily insane. To maintain such defense, he introduced a number of lay witnesses, who testified that after appellant's son was convicted upon his second trial on the

charge of highway robbery, the defendant brooded over the jury's verdict returned against his son and talked practically continuously about his son's not being guilty; that when defendant was arrested and taken to jail for shooting the deceased (the jailer and his deputy testified), he acted like a crazy man and continuously complained of his head hurting him; that while in the jail, he would put blankets around his head and mumble and talk to himself; that for a few days he ate practically nothing; that he would often go to bed, stay a few minutes, get up and go to bed again.

Appellant testified, in his own behalf and in support of the theory of his defense, that he was temporarily insane and irresponsible at the time he shot and killed the deceased; that on the day his killing of the deceased was said to have occurred, he had gone to Mt. Vernon to attend the trial of his son upon a robbery charge and had there been greatly disturbed and upset by the severe arraignment of his son by the commonwealth's attorney, who exhorted the jury to return a death sentence against him; that the last thing he remembered about the trial was, "Judge Kennedy begging to give my boy a death sentence and turn the juice on him and hear his bones crush and his flesh fry"; further, that he had no remembrance of meeting and shooting Arthur Mullins on the streets of Mount Vernon following the conclusion of his son's trial; that he had never before that time had trouble with the deceased, nor had anything against him or any wish or desire to do him any harm or to injure him in any way.

Defendant, in further support of his contention that he, at the time of committing this homicide, was temporarily insane and without the power of distinguishing right from wrong, or the power to overcome an irresistible impulse to kill, sought to introduce as expert witnesses Drs. John J. Moren, Geo. P. Sprague, T. A. Griffith, John C. Baker and M. Pennington.

Upon the examination of the last three named of these several physicians, it appeared that no one of them had ever treated the defendant for a mental disease or made any personal observation of the condition of defendant with respect to his being so afflicted. Their testimony, therefore, of necessity was limited to giving their expert opinion as to whether or not the defend-

ant at the time of the homicide was of unsound mind when his mental condition was such as portrayed by the recitals in respect thereto presented in the hypothetical question submitted.

Two of these doctors, Sprague and Moren, offered as experts, were allowed to answer the hypothetical question submitted them, as having upon their examination established their qualification as such, by showing that they were specialists in the study and treatment of mental diseases and that their practice and experience had been devoted exclusively to the study and treatment of patients with mental and nervous trouble for a period of thirty or forty years.

Upon being permitted to give their expert opinion, in answer to the hypothetical question submitted them, and based upon the assumption of the truth of the facts recited in the supposed case, they each stated that in their opinion the person described by the facts recited in the hypothetical question was not in his right mind or that he was, at the time of the homicide, of unsound mind. Upon cross-examination, these two specialists, Drs. Sprague and Moren, stated that they did not think the defendant at the time of the homicide knew right from wrong and that he, while acting in the mental state depicted by the facts therein recited as assumed in the supposed case, would not have the ability or knowledge to resist committing the particular crime here involved.

Further, Dr. Sprague testified that he had never been acquainted with the defendant and had refused to testify in the case until he had examined the defendant to see whether he was "frauding," after which he thought he was able to tell what was the defendant's condition of mind at the time of the homicide committed in April, some eight months previous.

Upon the examination made of Drs. Baker, Pennington and Griffith, whom the appellant sought to introduce also as experts to answer practically the same hypothetical question propounded to the other two doctors, it was ruled that they had failed to qualify as experts and that therefore their testimony, expressing their opinion as experts, as to the defendant's soundness or unsoundness of mind at the time of his shooting and killing of the deceased, should be stricken from the record.

These doctors each testified that they had never treated the defendant for any mental trouble nor had they ever observed his manner of acting or speaking as evidencing mental trouble at any time. Further they stated that while they were graduate and licensed physicians, two of them stated that they were general practitioners only and had made no special study and had no special experience in the treatment of mental diseases.

However, of these, Dr. Griffith, when examined in regard to his qualification to testify as an expert, stated as follows:

"Q. Have you had any experience in treating nervous diseases? A. Yes, I was on service at the Louisville City Hospital for three months and during the four years of my internship, I was at the Good Samaritan Hospital and I taught nurses psychiatry for three months.

"Q. Does that study deal with the mind? A. Yes, mental diseases and insanity."

Further he was asked:

"Q. Do you regard yourself as an expert on the question of mental diseases? A. I believe I have had more experience along that line than the average practitioner.

"Q. I asked you a question to be answered yes or no. Do you regard yourself as an expert on mental diseases? A. I am no specialist on that."

Notwithstanding this showing made by Dr. Griffith of his qualification to testify as an expert, the court ruled his answers given failed to qualify him as such and accordingly ruled that his testimony also, given as an expert in answer to the hypothetical question asked him, should be stricken from the record, along with that given by Drs. Baker and Pennington.

Upon the conclusion of the introduction of defendant's evidence, the commonwealth called Bert Mullins to testify in rebuttal. Objection was urged at the time he was introduced to his testifying, upon the ground that although the defendant had moved for the rule at the beginning of the trial, requiring all witnesses to leave the courtroom during the examination of witnesses, this witness offered in rebuttal had remained

within the courtroom and heard the testimony of the other witnesses, notwithstanding the court had ruled, in sustaining said motion, that all witnesses should leave the courtroom.

This witness testified in rebuttal that he had worked with the defendant on the state highway in Rockcastle county for a couple of months, up until within some three or four weeks of the occurrence of this homicide, and that during such time he was repeatedly thrown with the defendant, when he both talked with him and observed his conduct and character of behavior, and that he saw nothing whatever unusual or uncustomary in any respect about it.

Upon submission of the case to the jury, upon conclusion of the introduction of the evidence, the court's instructions given the jury as to the law of the case and after hearing argument of counsel, it retired and returned its verdict finding the defendant guilty of the offense charged and fixing his punishment at life imprisonment, upon which sentence was accordingly duly entered.

Appellant has appealed, seeking a reversal of this judgment upon the grounds: (1) That the court erred to his prejudice in allowing the jury to hear incompetent evidence offered by the commonwealth; (2) that it erred in excluding from the jury competent evidence offered by defendant; and (3) that instructions 1, 2 and 4 as given by the court, upon its own motion, were erroneous.

Turning now to a consideration and disposition of these objections, the first is that the court prejudicially erred in permitting the witness, Bert Mullins, to testify when called in rebuttal, because of his having remained in the courtroom and heard the witnesses testify after defendant's motion for the rule had been sustained by the court.

While section 601 of the Civil Code of Practice provides that, ''if either party require it, the judge may exclude from the court-room any witness of the adverse party not at the time under examination, so that he may not hear the testimony of the other witnesses,'' we have repeatedly construed this code provision, excluding witnesses from the courtroom where the rule is asked,

not as mandatorily requiring the exclusion of witnesses from the courtroom, but as leaving the question of their exclusion to the court's exercise of a sound judicial discretion in determining the matter. Moore v. Commonwealth, 223 Ky. 128, 3 S. W. (2d) 190; Mink v. Commonwealth, 228 Ky. 674, 15 S. W. (2d) 463; Johnson v. Clem, 82 Ky. 84, 5 Ky. Law Rep. 793; Salisbury v. Commonwealth, 79 Ky. 425, 3 Ky. Law Rep. 211; Walker v. Commonwealth, 71 Ky. 86, 8 Bush 86.

In view of such being our construction of the code provision, to the effect that the court's ruling in allowing a witness to be called and to testify, who has remained in the courtroom after the rule was granted, is a matter resting in the sound discretion of the court and that the same will not constitute grounds for a reversal unless the court is shown to have abused its discretion in its ruling and which has operated to the prejudice of the defendant's substantial rights, we are of the opinion that this point is not meritorious and should not be sustained.

The next objection urged is that the court erred in rejecting competent evidence. It relates to the court's ruling in striking the testimony given by Drs. Griffith, Baker, and Pennington as expert witnesses upon the subject of mental diseases.

It is very earnestly insisted in brief of counsel for appellant that by this ruling the appellant was greatly injured and prejudiced in his substantial rights, in that the excluded expert testimony of these three doctors, given in answer to the hypothetical question asked them, was that in their expert opinion the defendant was at the time of his shooting and killing the deceased temporarily insane or of unsound mind; that these doctors were competent to testify as experts, were all graduates of medical schools and licensed and practicing physicians who, as testified by them, had been respectively for more than a year or for much longer periods engaged in the general practice of medicine, in treating the diseases with which their patients were affected; that as these doctors possessed these qualifications, the exclusion of their proffered testimony as experts from the jury was prejudicially erroneous, in that they, having such qualifications, as testified by them, were competent to testify as experts; that their testi-

mony should not have been stricken, but left before the jury for the determination by it of its credibility and weight.

In further support of the contention that appellant was prejudiced by the taking of this evidence from the consideration of the jury, he insists that the testimony of these physicians, which was erroneously excluded by the court, was particularly important, in that, though two specialists (both eminent and generally recognized as being experts in the treatment of mental diseases) had been held qualified to testify as experts and answer the hypothetical question submitted them, and had stated that in their expert opinion the defendant at the time of committing this homicide was insane or of unsound mind, they were not personally known to the members of the jury, as were the other three doctors, who had also unsuccessfully undertaken to testify as experts before them; that the testimony of these local doctors, who were well known to the members of the jury, would have carried far greater weight with them than that given by the foreign experts.

However, we deem it sufficient answer to this contention to state that this court has otherwise and adversely decided it.

In the case of Abbott v. Commonwealth, 107 Ky. 624, 55 S. W. 196, 21 Ky. Law Rep. 1372, the defendant upon trial had been found guilty of manslaughter, from which he prosecuted an appeal. There on the facts, which the testimony introduced clearly established, the appellant asked the court for an instruction directing the jury that if he were of unsound mind at the time of the killing, they should acquit him.

In that case, as in the instant one, there was no question of self-defense presented or that the deceased had made any attack on appellant, but only the question of whether the appellant was of sound or unsound mind at the time he shot the deceased.

The court, in considering the testimony on this question, said [page 198]:

"The testimony of Dr. Wright was properly rejected, as it did not appear that he had given the subject of insanity a sufficient study to entitle him to speak as an expert on the hypothetical case put to him."

Again was the rule so announced in Bishop v. Commonwealth, 58 S. W. 817, 22 Ky. Law Rep. 760, where we said [page 818]:

"Nor can we perceive any error in the rulings of the court as to the evidence of the two doctors introduced by the defense. The court excluded entirely the evidence of one of the physicians, and refused to permit the other to answer a question in regard to a hypothetical case. Neither doctor qualified as an expert upon the subject of insanity."

Applying the rule as here announced, as a criterion by which is to be determined the propriety of the court's ruling ·excluding the testimony given by Drs. Pennington and Baker, when undertaking to answer the hypothetical question submitted to them as experts, we must conclude that the court's ruling was proper.

. However, while we are of the opinion that Dr. Griffith did, upon his examination made of his qualification to testify as an expert, show himself so qualified, by reason of his having both studied and taught for some months at a hospital psychiatry, dealing with mental diseases and insanity, and had also had more experience in the treatment of such diseases than the average physician, though he did not claim to be a specialist, and that the court should have, such being his qualification, allowed him to testify as an expert, we are yet of the further opinion that under the circumstances here appearing, the ·defendant was not substantially prejudiced by reason of its exclusion. Such is our view, by reason of the fact that two eminent specialists in mental diseases had already stated, in answer to substantially the same hypothetical question submitted them, that they regarded the defendant, or person described in the hypothetical case, as being of unsound mind and without the ability, in his then temporary insanity, to either distinguish between right or wrong or to resist the im·· pulse then dominating him and urging him to kill.

Dr. Griffith's testimony, which we conceive was improperly excluded, was yet but cumulative in its character and perhaps it may be remarked that, he having at the time of the trial only been licensed to practice for something over a year, his expert opinion was hardly of importance or needed by the defendant for establishing by expert testimony that he was at the time of

the commission of the homicide of unsound mind, in view of the expert testimony given by the two eminent experts and specialists in mental diseases.

We are therefore led to conclude that this contention of the appellant is insufficient to show any substantial prejudice was suffered by him, by reason of the court's ruling made excluding the evidence, even conceding the ruling was erroneous.

The last objection urged is a criticism of instructions Nos. 1, 2 and 4 as given by the court. Of these, appellant in his brief only discusses and argues that instruction No. 4, as given by the court, is improper.

This instruction is as follows:

"The court further instructs the jury that although they may believe from the evidence that the defendant at the time of the killing of Arthur Mullins had not sufficient reason to know right from wrong, or was without sufficient power to govern his action by reason of some impulse which he could not resist or control, yet if they further believe from the evidence that such lack of reason to know right from wrong, or such insufficient will power to govern his actions or to control his impulses, arose alone from voluntary drunkenness then existing, but not from unsoundness of mind, they should not acquit the defendant on the grounds of insanity."

The appellant criticises the same as erroneous by reason of the qualification added by the last part of the instruction to the insanity instruction above given. The jury were told that though they believed the defendant was insane or had not sufficient reason to know right from wrong, etc., they should yet not acquit the defendant if they further believed that such insanity or lack of reason arose from voluntary drunkenness.

Substantially this same instruction was given as instruction No. 8 and approved in Mathley v. Commonwealth, 120 Ky. 389, 86 S. W. 988, 27 Ky. Law Rep. 785. In answering the criticism of that instruction, the same as No. 4 here given and attacked, we said [page 989]:

"Instruction No. 8 is criticised because it is said that it takes from the jury the right to find the defendant insane, although his mind may have been so diseased by long drunkenness as to deprive him of

the power of knowing right from wrong, or of will power sufficient to govern his actions, provided this condition was superinduced alone from voluntary drunkenness. If the inference which counsel draw from the language of the instruction in question is correct, their objection to it is well founded; but an analysis of it shows that it clearly distinguishes between the lack of reason or will power arising from voluntary drunkenness and the want of these mental powers arising from unsoundness of mind. The instruction tells the jury plainly that, if appellant's lack of reason or will power arose alone from voluntary drunkenness, but not from unsoundness of mind, they should not acquit him on the grounds of insanity. This instruction is copied from one approved by this court in Wright v. Commonwealth, supra [72 S. W. 340, 24 Ky. Law Rep. 1838], and we adhere to it as a sound exposition of the law on the subject of which it treats.''

Also, it may be here, as in the Mathley Case, said that ''this homicide was either one of atrocious and brutal murder or the appellant was insane. His insanity, therefore, was the one real, substantial question in the case. There was evidence both for and against him on this proposition, and the jury, who were the final arbiters as to the facts, found this issue against him.''

A careful consideration by us of the whole record serves to convince us that the appellant has had a fair and impartial trial at the hands of both the court and the jury and that his defense was fully presented.

Therefore, perceiving no prejudicial errors appearing in the record, upon a consideration of the whole case, we are satisfied that the substantial rights of the appellant have not been prejudiced, but that he has received a fair and impartial trial.

Judgment affirmed.