## Voice v. Commonwealth.

Nov. 15, 1940.

Watt M. Prichard, Judge.

A. W. Mann for appellant.

Hubert Meredith, Attorney General, and H. Appleton Federa, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY SIMS, COMMISSIONER—Affirming.

Appellant, Jesse Voice, alias Frank Vitale, was

convicted of the crime of assault with an offensive weapon with intent to rob as denounced in Section 1160, Kentucky Statutes, and his punishment was fixed at confinement for 21 years in the penitentiary. In seeking to reverse the judgment he assigns two errors: 1. The court admitted incompetent evidence against him; 2. the verdict is flagrantly against the evidence on the question of insanity.

Jesse Voice is a Jewish boy, 18 years of age, who does not deny the commission of the crime for which he was convicted and his sole defense was insanity. The evidence shows his father is an optometrist in New York City and while appellant worked in his father's store he was entrusted with making bank deposits. He pocketed these deposits and wrote the amounts thereof in the pass book. After thus accumulating about $300, he stole some gold (used in making rims for spectacles) from his father's shop. He then started by bus to New Orleans to visit Mardi Gras, but stopped at Huntington, W. Va., where he registered at one of its best hotels under the name of Frank Vitale. Appellant supplied himself most bountifully with champagne and whiskey, and while visiting the Continental Club in Chesapeake, Ohio, just across the river from Huntington, he met a prostitute about his age and brought her to his hotel where she remained for four days.

In the course of a week his funds were running low, as was his supply of champagne and liquor, and he tried to sell at a Huntington pawn shop some of the gold he had stolen. Upon information from this shop that it did not buy such gold but that he could sell it in Baltimore, he mailed twenty ounces of gold to the address of the Baltimore firm given him by the pawn shop, directing it to mail him check in payment therefor to the Kentucky Hotel in Louisville, Ky. He next purchased a pistol in Huntington, then went to Ashland, Ky., some fourteen miles distant, and about dark located a liquor store in which there were no customers and with only a woman in charge. He asked this woman if she had champagne, and when she replied in the affirmative, he requested her to write the names of the brands on a paper for him. While she was thus engaged, he drew his pistol on her, forced her to open the cash register from which he took all the money, but left a check, hit her over the head with the pistol and departed.

After this robbery he went to the nearby beer saloon of Ned Howard, where he had bought several drinks of beer immediately preceding the robbery, and had a cab called for himself. He directed the driver to take him to Huntington, but instead of going to his hotel, he left the cab in an outlying district. The next day in robbing a newspaper office in Ironton, Ohio, he was captured by the police of that town. Soon after his arrest, appellant stated he intended to plead insanity, that he could get out of the case that way—that he knew all the angles. When inquiry was made of him why he did not rob the Continental Club and why he robbed a nice Jewish woman and hit her on the head, it is testified his replies to these questions were: "Yes, rob the Continental and get shot in three or four places," and, "Well, everything is fair in a hold-up".

Appellant's history is that he began to steal as a child of 5, but that he only stole from members of his family. He was unusually devoted to his mother, who died when he was twelve years old, and after her death he began to stammer and became difficult to control. He went as far as the third year in high school, wanted to specialize in chemistry, but his father insisted upon him becoming an optometrist. From his father and stepmother he stole money and jewelry, the latter he disposed of in pawn shops for only a small fraction of its value. He ran away from home on several occasions while in high school, once going to the west coast and on another occasion to Texas. It was both troublesome and expensive for his father to go after him when he would run away, and after several such experiences, the father committed appellant to the Brooklyn State Hospital on May 13, 1939. He remained there under observation until June 9, 1939, when the medical staff of the hospital, composed of five doctors who are supposed to be experts on mental diseases, pronounced appellant a maladjusted individual, but sane, and discharged him from the hospital.

On his trial four medical experts residing in New York testified by interrogatories. In answer to a long hypothetical question embracing practically all the facts detailed above, each of these doctors pronounced appellant insane. Dr. Reaser, a psychiatrist, and assistant superintendent of the State Hospital at Huntington, testified in person for appellant, stating he was suffering

from dementia praecox—simple type, into which class most of the tramps, vagabonds, hobos and prostitutes belong; that while appellant might know right from wrong he could not resist following the wrong impulse. In Dr. Reaser's opinion appellant was of unsound mind.

Dr. Stone testified in person for the Commonwealth, and in answer to practically the same hypothetical question asked the other doctors he gave as his opinion that appellant was sane. It is argued that Dr. Stone's testimony should have been excluded on appellant's motion because he failed to qualify as an expert on mental diseases. Dr. Stone testified he was not a specialist on mental diseases, but that he had training in that line of work in medical college and had three years' experience with mental cases in hospitals at Cleveland and Detroit. In Bishop v. Com., 109 Ky. 558, 60 S. W. 190, 22 Ky. Law Rep. 1161, it was written that the doctors who were attempting to qualify as experts had no experience whatever in the treatment of mental diseases, and as far as that record showed neither of them had ever seen an insane person, and the court rejected their testimony. While the testimony of the doctor was properly rejected in Abbott v. Com., 107 Ky. 624, 55 S. W. 196, 198, 21 Ky. Law Rep. 1372, because he was not qualified to testify on mental diseases, it was said:

"The testimony of Dr. Wright was properly rejected, as it did not appear that he had given the subject of insanity a sufficient study to entitle him to speak as an expert on the hypothetical case put to him. It is not necessary that the witness should claim to be an expert. Any practicing physician, doing a general practice, who has studied the subject of diseases of the mind, with other forms of disease, may testify on the hypothetical case, on the ground that, as insanity is a disease, one who is skilled in detecting and treating diseases is competent to give an opinion, the extent of his learning and experience going alone to his credibility. 2 Bish. Cr. Proc., Section 687."

Under this rule Dr. Stone qualified to testify on mental diseases, even though he did not claim to be an expert thereon, since he had studied the subject in medical college and had three years' experience in that line of work in hospitals in two large cities. See Robertson v. Com., 275 Ky. 8, 120 S. W. (2d) 680.

The court allowed five lay witnesses to give their opinions as to whether or not appellant was sane or insane, based upon their observations of him, each of whom testified he was sane. But the court excluded the testimony of two other lay witnesses on this subject on the ground that they had not had sufficient opportunity for observation of appellant to support their opinions. It is not strongly insisted that the jailer who had charge of appellant for four months, and the chief of police, who saw him many times and talked to him a great deal, were not competent lay witnesses on appellant's sanity. But it is argued that the court should not have allowed the three witnesses who saw him only on the day of the robbery in Ashland to give their opinions that he was sane, it being contended they did not have sufficient opportunity for observation to support their opinion.

A lay witness who has had ample opportunity for observation and who gives the facts upon which he bases his opinion may testify as to whether or not a person is sane, 7 Wigmore on Evidence 39, Section 1938; Abbott v. Com., 107 Ky. 624, 55 S. W. 196, 21 Ky. Law Rep. 1372; Banks v. Com., 145 Ky. 800, 141 S. W. 380; Maulding v. Com., 172 Ky. 370, 189 S. W. 251. In the Banks and Maulding cases it is pointed out that one who sees the object of the inquiry only a few times and has no intimate acquaintance or association with him is not competent to express an opinion on the soundness of his mind. However, in cases where a lay witness is allowed to testify as to a person's mental condition it is for the jury to determine for themselves the weight to which such opinions are entitled, which is largely governed by the opportunity for observation and the facts detailed to the jury as a basis for the opinion the witness expresses. Conceding, but not deciding, that the witnesses Ned Howard, Cole and Flinchum did not have sufficient opportunity to observe appellant to determine whether or not he was of sound or unsound mind, yet they detailed to the jury the facts upon which they based their opinions, and we must presume the jury did not accept such opinions as binding upon them, but weighed for themselves the facts upon which the opinions were based and took into consideration the opportunities the witnesses had to observe appellant. Such testimony could not have been prejudicial to appellant's substantial rights since the jury saw appellant, heard him testify at length

and doubtlessly they were influenced as much by his testimony, the manner in which he gave it, and his demeanor on the witness stand, as they were by what both lay witnesses and medical experts said as to his mental condition.

Appellant's contention that the court erred in permitting testimony concerning the Ironton robbery is without merit. On his direct- examination appellant testified as to this crime. It is obvious that after he opened the gate the Commonwealth had a right to come in and to travel the road to its end. Catron v. Com., 268 Ky. 536, 105 S. W. (2d) 618; Puckett v. Com., 235 Ky. 340, 31 S. W. (2d) 383.

We cannot agree with the argument that the verdict is flagrantly against the evidence. It is true appellant introduced five medical experts, while the Commonwealth introduced but one; however, the hospital record of appellant, which constituted part of the foundation of the hypothetical question on insanity, showed he was released as sane from the Brooklyn Hospital in June before the crime with which he was charged was committed in January. The jury saw appellant on the witness stand, heard him testify with what cunning he stole from his father, how carefully he planned this robbery and his escape, and heard other witnesses testify he stated he did not attempt to rob the Continental Club because of the danger connected therewith. The jury was not obliged to accept the statements of appellant's medical experts and had the right to reject it and base their verdict on the evidence introduced by the Commonwealth and on appellant's own testimony, his demeanor and actions. It was reasonable for the jury to find appellant sane under the evidence presented in this record, therefore, the verdict is not flagrantly against the evidence. Shepherd v. Com., 236 Ky. 290, 33 S. W. (2d) 4; Salley v. Com., 277 Ky. 330, 126 S. W. (2d) 438.

Perceiving no error in the record prejudicial to appellant's substantial rights, the judgment is affirmed.