## Hall v. Commonwealth

Oct. 10, 1944.

A. W. Mann for appellant.

Eldon S. Dummit, Attorney General, and Thomas Burchett for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

At about 7:30 p. m., October 16, 1943, appellant shot and killed Ethel Buck. A true bill charged her with wilful murder. Upon trial the jury. returned a verdict of guilty, fixing punishment at confinement for life in the reformatory, and from a judgment in conformity she prosecutes appeal. As the case comes to us, counsel insists that the judgment should be reversed because the trial court erred to appellant's prejudice in (1) failing to give an instruction on voluntary manslaughter; (2) in permitting incompetent and prejudicial evidence to go to the jury over objections.

Appellant, pleading not guilty, admitted that she shot and killed Ethel Buck, and undertook to show that at the time she was mentally irresponsible. The evidence as adduced presents rather a sordid picture, involving the lives of parties connected with the story of the killing and the background. There is no doubt from a perusal of the record that the tragedy was the outgrowth of continuing intimacies existing between apellant's husband and Ethel Buck.

Appellant was about fifty years of age at the time of the killing, and had been married twice prior to her marriage with Hall. She had been divorced from her first husband, and thereafter married one Smith, and they conducted a rooming house in Ashland. They finally separated and she later obtained a divorce. Without going into details, the proof shows her life, or at least after she grew up, was one of frustration, disappoint-ments and griefs.

Some time in 1941 she met Fred Hall, a gambler, without legitimate gainful occupation. About two years later Hall began illicit relations with Ethel Buck. They made frequent trips together for the purpose of illicit relations, some to distant places. Following his return

from these trips the husband would confess his derelictions and receive forgiveness, and make promises not to again offend. On October 14th Ethel Buck had returned from a trip, and registered at a local hotel. She communicated with Hall, who repaired to the hotel and resumed relations. When he returned home he told his wife that he had been with his "woman." At this time appellant was operating a hotel, which according to the proof was of unsavory reputation. The homicide occurred on October 16. Appellant's testimony is to the effect that she left her home about 7:30, as she says to go to some place and get a coca-cola, and with no other intention. She went directly to the P. K. Grill. When she got into the room Ethel Buck was at the counter, and "kind of snarled at me." Appellant proceeded to the rear of the room, and then came back toward the front, and Ethel "made a face" at her. She then says she got to thinking about the relations between her husband and deceased; the trip to Baltimore, and the meeting at the local hotel, "and my mind went blank and I don't know how I got my gun or nothing. It all just went blank to me." After that time her mind "just came and went." She did not recall anything she said to any one while in the grill, or for some time thereafter. She said that she carried the pistol for protection since she had a "right smart of money" with her at times.

Two doctors testified. One had examined appellant in November 1943. He described her physical condition and found it to be such as would lead to a neurotic condition. Given a hypothetical question, which dealt with appellant's past history, the facts and circumstances under which she and her husband had lived, and such as related to the shooting, the doctor expressed the opinion that at the  time of the homicide she was of unsound mind; was temporarily incapable of resisting the impulse to do the act. Another physician substantially corroborated him. Dr. Lyon, especially qualified in psychiatry, who had heard the evidence throughout the trial, and the technical question, expressed the opinion that at the time of the homicide she had sufficient mind to know right from wrong, and was not acting under a temporary impulse. This phase of the case need not be discussed at length, since we observe that the court gave instructions upon the insanity issue in form and substance frequently approved by the court, and about which no complaint is made.

At the time of the shooting Ethel Buck was in a telephone booth. The first shot fired entered her back; she fell on the floor and appellant fired five more shots into her body between the waist line and head. Before the last shot was fired she was heard to say: "I don't guess you will tear up any more homes." Of this remark, and others charged to have been made, she said she had no recollection. It is unnecessary to detail other proof or circumstances which tended to evidence premeditation.

The court gave an instruction on murder, and as noted above, on the question of insanity. Coming now to the vigorous contention that appellant was entitled to an instruction on voluntary manslaughter, we have been pointed to no case which is specific on this point; appellant relies on Shepherd v. Com., 119 Ky. 931, 85 S. W. 191, 192, where the court in discussing the admissibility of certain evidence, drifted into the question of allowable defenses. The defense was emotional insanity. Appellant and his wife had separated two years before the homicide, the separation being caused, as claimed by Shepherd, by Webb's interference in domestic relations. The husband and wife became reconciled at her father's home, and agreement was reached. Shepherd started to leave, but for some reason turned back and found Webb and the wife together. The next morning appellant was taking the wife to his home; Webb appeared at the house, and the wife told appellant that Webb had threatened to kill him if he pursued the intention to take her away. He was much disturbed and picked up a rifle and fatally shot Webb. The defense was insanity, and the court reversed chiefly because of introduction of proof of other crimes. The question of instruction on voluntary manslaughter was not up, but the court wrote: "If the fact be that deceased, Webb, had violated the sanctity of appellant's home, had estranged his wife's affections, had debauched her person, and had threatened appellant's life, . * * * forcing his presence upon them for that apparent purpose, human nature is so constituted that the passion of the husband may well be supposed to have been aroused to an uncontrollable extent. Whether it was such as to have created an emotional insanity, so as for the time to dethrone the reason of the outraged husband, or whether it merely reduced the homicide to manslaughter, was a question which, under the circumstances, should have been sub-

mitted to the jury." Appellant relies also on Shipp v. Com., 124 Ky. 634, 99 S. W. 945, 10 L. R, A., N. S., 335. It is unnecessary to relate the facts, further than to say Shipp had, prior to the killing of Smith, become convinced of illicit relations between his wife and Smith. Seeing Smith on the street, Shipp walked across to a store and rented a gun, proceeded across the street and killed Smith. Here the circumstance tended to show premeditation. Shipp plead insanity. The court gave the voluntary manslaughter 'instruction, and the only discussion was as to whether or not it was in proper form and substance; we reversed with a suggested form.

We reversed judgment in Vaughn v. Com. 204 Ky. 229, 263 S. W. 752, 754, on grounds of the court's failure to give the requested voluntary manslaughter instruction, where it appeared the killing was due to a state of mind brought about by knowledge of illicit relations between the wife and deceased. In that case there was perhaps less showing of premeditation than here. We applied the rule as announced in many cases: "It is a well settled rule of law that instructions applicable to every state of case deducible from the testimony or supported by it to any extent should be given," citing numerous like pronouncements.

In Cottrell v. Com., 271 Ky. 52, 53, 111 S. W. 2d 445, a case of killing when there had existed illicit relations between the wife and victim, and plea of insanity, the court gave instructions, as in this case, on voluntary manslaughter. It was argued that the instruction was erroneous since the proof showed that the killing was "murder or nothing." In the opinion we said, in substance, that in a prosecution for murder occasioned by knowledge of an illicit relationship existing between a wife and the victim, and the shooting might be the result of a sudden uncontrollable passion, the court properly gave manslaughter instruction as against the contention that there was no middle ground. In the recent case of Horn v. Com., 292 Ky. 587, 593, 167 S. W. 2d 58, 61, where there was a defense of insanity brought on by excessive use of alcoholic liquor, and it was contended as here, that the crime was murder or nothing, and hence the voluntary manslaughter instruction was erroneous, we passed the objection, saying: "But little need be said with reference to it, since in a number of the cited domestic cases, supra, as well as texts to which we have had access a vol-

untary manslaughter instruction is proper under the facts disclosed by this record on the ground that defendant's condition, howsoever produced, may have been such as to deprive him of the necessary element of malice, or malice aforethought essential to create the crime of murder, and it is for that purpose that the courts, without exception so far as we are aware, declare that in such conditions the voluntary manslaughter instruction should be given.''

From a reading of these cases, and others, it may be concluded that in cases where it may appear ''under facts disclosed,'' that the homicide may have been committed under the influence of sudden passion, arising from adequate provocation which may render the mind incapable of cool reflection, the court should give the jury the right to determine the question under appropriate instructions.

It may be admitted that there was here presented testimony as would justify a reasonable mind in concluding that there was premeditation and malice; on the other hand the court must realize that appellant here denied many if not all of the specific charges, not remembering others, indicating the existence of those factors; the claim that she left her home for an innocent purpose, and became much frustrated by the presence and actions of Ethel Buck, and the previous conduct, and unable to control her emotions or resist an irresistible impulse, presented a situation which authorized an instruction on voluntary manslaughter.

During her cross-examination appellant was asked, over repeated objections, and permitted to answer, without admonition, the following questions: ''Have you ever been indicted for operating a disorderly house there?'' ''Have you been convicted of that?'' ''Have you ever been charged with contributing to juvenile delinquency by permitting girls 14 or 15 years of age to go to rooms with men?'' She said that it had happened on two occasions, and undertook to explain that her clerk was responsible, and was asked, ''You done time on both occasions, didn't you?'' ''Wasn't you charged with some sort of crime in Judge Bell's court, charged with contributing to juvenile delinquency?'' ''Did you ever live with a man named Elmer Stallard?'' and other questions of similar character and import. Many of these were answered in the affirmative; some with ac-

companying explanations, but it is apparent to us that this line of testimony was indulged for the purpose of prejudicing the minds of the jury. This course cannot be sanctioned, though it may be in fact that the jury was not actually prejudiced.

Counsel for appellee insists that this line of evidence was competent because appellant had, in answer to her counsel's question, asked for the purpose of showing her varied and continued troubles, resulting in her claimed disturbed mental condition, said that in the spring of 1943 she had gotten into some trouble and Judge Rose had given her a jail sentence on a delinquency count. It is insisted that this course by appellant's counsel opened the door wide enough to justify the line of questioning indulged by the Commonwealth's attorney, and was allowable under the authority of Voice v. Com., 284 Ky. 416, 145 S. W. 2d 45, and the cases cited therein. If competent, as contended by appellee, the questions should have related to the one incident about which appellant testified. But the queries took wider range, and went beyond the bounds of legal propriety.

Section 597, Civil Code of Practice, applicable in criminal cases, provides that a witness "may be impeached by evidence that his general reputation for untruthfulness or immorality renders him unworthy of belief, but not by evidence of particular wrongful acts, except that it may be shown by the examination of a witness or record of a judgment that he has been convicted of a felony." Sessmer v. Com., 273 Ky. 40, 115 S. W. 2d 337, 340. Under this section we have held that proof of conviction of a misdemeanor is not competent. Forgy v. Com., 219 Ky. 177, 292 S. W. 799; Day v. Com., 256 Ky. 76, 75 S. W. 2d 741. General reputation for immorality may be shown in the manner provided, but not by references to specific acts. This testimony was not substantive under any of the exceptions to the rule laid down in the case of Morse v. Com. 129 Ky. 294, 111 S. W. 714, referred to in Farley v. Com., 263 Ky. 769, 93 S. W. 2d 858, which collates intervening opinions.

Over objection the Commonwealth introduced two or three witnesses who, under questioning, said that the reputation of the hotel operated by appellant was bad, the question embodying the query as to whether or not it was known as a disorderly house, a house of ill-fame, a bawdy house. These questions were irrelevant, and

like the others incompetent, and should not have been asked, nor allowed to go to the jury, and without admonition, even had they been relevant. They were not made competent by the testimony of Dr. Reaser on the theory that his testimony, based on past history or matter embraced in the hypothetical question propounded to him and other doctors, opened the door for the course pursued.

Judgment reversed with directions to grant appellant a new trial consistent herewith.