# IN THE MATTER OF THE PETITION FOR REIN-STATEMENT TO PRACTICE LAW OF MAURICE L. BRAVERMAN

[Misc. Docket (Subtitle BV) No. 7, September Term, 1973.]

*Decided March 1, 1974.*

The cause was argued before MURPHY, C. J., and BARNES, SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ.

*John F. King* for Maurice L. Braverman.

MURPHY, C. J., delivered the opinion of the Court. DIGGES, J., concurs and filed a concurring opinion at page 212 *infra*. BARNES and SMITH, JJ., dissent and SMITH, J., filed a dissenting opinion in which BARNES, J., concurs at page 213 *infra*.

Maurice L. Braverman was admitted to the Maryland Bar on October 7, 1941, and, thereafter, practiced law in Baltimore City for eleven years. On April 1, 1952, he was convicted in the United States District Court for the District of Maryland of conspiracy to teach and advocate and to organize the overthrow of the government by force or violence in violation of § 2 of the Smith Act, 18 U.S.C.A. 2385. He was fined $1,000 and sentenced to imprisonment for three years. On appeal, his conviction was affirmed. *Frankfeld v. United States,* 198 F. 2d 679 (4th Cir., 1952) *cert. den.* 344 U. S. 922 (1952). As the result of a petition filed by the Bar Association of Baltimore City, Braverman was disbarred from the further practice of law by order of the Supreme Bench of Baltimore City dated June 28, 1955. On appeal, we affirmed the order of disbarment. *Braverman v. Bar Association of Baltimore City,* 209 Md. 328, 121 A. 2d 473 (1955). In 1957, Braverman was disbarred from federal practice. *In re Braverman,* 148 F. Supp. 56 (D. Md.). On May 21, 1973, eighteen years after his original disbarment, Braverman filed a petition in this Court for reinstatement to practice law. He alleged that during the period following his disbarment, he established his trustworthiness, demonstrated his good moral character, and was now worthy of reinstatement to the Maryland Bar. In his affidavit accompanying the petition, Braverman recited that his association with the Communist Party ceased shortly after his release from prison in 1955; that he had established and conducted a bookkeeping service catering to small business concerns in the Baltimore metropolitan area, an occupation he continues to this day; that he was active in the political mainstream of our country, seeking to influence the passage of legislation and the election of men and women to office who best represent his concerns; that for the past four years he served as Treasurer of the New Democratic

Coalition, Fifth District Club; that he serves on the executive board of his community association; that he has become active in efforts to improve the criminal justice system, serving as President of the St. John's Council on Criminal Justice, Inc.; that at the invitation of the Attorney General of the United States, he had recently participated in the four-day National Conference on Criminal Justice in Washington, D. C.; and that for the last two years, he has been teaching courses on poverty and criminal justice in the Baltimore Free University held on the Johns Hopkins University campus. Numerous communications from citizens, including many lawyers, personally acquainted with Braverman's qualifications for readmission to the Maryland Bar were submitted in support of his petition for reinstatement.

On October 1, 1973, we ordered that Braverman's petition for reinstatement to practice law in this State be referred for an evidentiary hearing to a three-judge panel comprised of Judges J. Harold Grady and David Ross of the Eighth Judicial Circuit of Maryland and Judge Mary Arabian of the District Court of Maryland. *See In re Braverman,* 269 Md. 661, 309 A. 2d 468. We directed that Braverman, the Maryland State Bar Association and the Bar Association of Baltimore City, and other proper parties, be permitted at the hearing to offer relevant and material evidence, to cross-examine, and fully argue the merits of the petition for reinstatement to determine whether, in light of the principles articulated in *In re Meyerson,* 190 Md. 671, 59 A. 2d 489 (1948) and *Maryland State Bar Association v. Boone,* 255 Md. 420, 258 A. 2d 438 (1969), Braverman had in the period following the rendering of the judgment of removal, become rehabilitated and a proper person to be admitted to the bar, *viz.,* whether he could demonstrate "fitness acquired since unfitness was established by the disbarment." 190 Md. at 687. We directed that in making its recommendation to us, the three-judge panel should evaluate, in particular, these four factors:

1. The nature and circumstances of Braverman's original misconduct.

2. His subsequent conduct and reformation.
3. His present character.
4. His present qualifications and competence to practice law.

The evidentiary hearing was held before the three-judge panel on October 15, 1973. Braverman testified on his own behalf, as did a number of citizens, including lawyers, judges, educators, and state officials. Each gave testimony clearly tending to demonstrate that Braverman had rehabilitated himself in the period following his disbarment and had become a proper person to be admitted to the Bar of Maryland. No contrary testimony or evidence was adduced. The Maryland State Bar Association, acting through its Board of Governors, and after conducting its own investigation, unequivocally recommended that Braverman be readmitted to practice law in this State. The Bar Association of Baltimore City, acting through its President, told the three-judge panel that "there has not been a scintilla of evidence presented to the Executive Council of the Bar Association of anything derogatory about Mr. Braverman . . . [and it had no] information that is contradictory to what these individuals [those persons testifying and writing letters on Braverman's behalf] state about his character and his honesty and his trustworthiness since his release from prison and during the period subsequent to his release."

The three-judge panel concluded that Braverman had established "by clear and convincing proof his fitness to practice law" and recommended that he be reinstated as a member of the Bar. The panel's recommendation was supported by these observations and findings succinctly set forth in its opinion:

### "NATURE AND CIRCUMSTANCES OF ORIGINAL MISCONDUCT

"The Court of Appeals in *Braverman vs. Bar Association of Baltimore City*, 209 Md. 328, found that the misconduct for which the Petitioner was disbarred consisted of his conviction

of conspiracy to violate Section 2 of the Smith Act, that this conviction was one involving moral turpitude, and that these facts constituted sufficient cause of disbarment. In its per curiam opinion in the present proceedings [269 Md. 661, 309 A. 2d 468 (1973)] the Court of Appeals points out that this panel must proceed in its deliberation from the premise that Petitioner's conviction above referred to is conclusive proof of his guilt of the crime of which he was convicted. Maryland Rules BV4 f 1 and BV9 d 4. Consequently, this panel cannot consider as having any effect Petitioner's testimony before us that his conviction was founded on insufficient evidence and that he was innocent of the crime charged. Rather he remains a convicted, unpardoned felon.

"Proceeding from this restricted basis, what consideration can this panel give to the nature and circumstances of Petitioner's original misconduct? We find relevant the position taken by the Maryland State Bar Association that Petitioner's misconduct which resulted in his conviction was largely political in nature and should be viewed in the light of present realities. Although we do not consider court decisions rendered after Petitioner's conviction as undermining the conclusive proof of his guilt, we do consider as relevant the change in attitude which is evidenced by such decisions. We find it amply demonstrated that developments in the law have necessitated a change in judicial and prosecutorial attitude. We also believe that since Petitioner's disbarment public acceptance of the change in legal attitude, public attention to civil rights generally and the right of dissent particularly, and public emphasis on detente with communist nations in our foreign affairs all have tempered the attitude of the public toward one in the Pe-

titioner's position. Great weight must also be given to the fact that Petitioner's reinstatement is recommended by the Maryland State Bar Association representing the majority of attorneys practicing in this state.

"Considering today the nature and circumstances of the Petitioner's misconduct, we conclude that his reinstatement would not be prejudicial to the administration of justice.

\* \* \*

### "PETITIONER'S SUBSEQUENT CONDUCT AND REFORMATION

"The evidence produced by Petitioner concerning his conduct since disbarment satisfies us that not only has he not conspired to teach and advocate the violent overthrow of the government but that his subsequent disassociation from the Communist Party and disenchantment with communism as it exists in the Soviet Union have characterized his activity. We find that Petitioner's evidence has overcome the weight of the facts adjudicated against him by his conviction, *i.e.*, advocacy of violent overthrow, and that his activities of a political nature have been entirely within the mainstream of our system. In addition, no evidence to the contrary was presented.

"As to Petitioner's reformation, the Baltimore Bar Association raises the philosophical question of how Petitioner has proven his reformation when he refuses to recognize the existence of any misconduct from which to reform. Since Petitioner is adamant in his belief in his innocence, he is consistent in not expressing any repentance. While he seems to hinder his cause by not taking what might be the easier way of confession and contrition, the intellectual honesty of his position must be

recognized. Reform has been defined as: to change from worse to better, to bring from a bad to a good state. We believe Petitioner has demonstrated his reformation without an expression of contrition from him. Starting from the premise that his guilt was conclusively proven, we find his conduct since conviction to be a complete turnabout from that which resulted in his conviction. We find his conduct since conviction to be totally inconsistent with the probability of repetition of his previous misconduct. We believe this constitutes reformation as this term is used in the present proceedings.

## "PETITIONER'S PRESENT CHARACTER

"We find the impressive and unchallenged evidence presented by Petitioner of his present good character clearly establishes his eligibility for reinstatement on this score.

## "PETITIONER'S PRESENT COMPETENCY

"Evaluation of Petitioner's present qualification and competence to practice law in the light of his long absence from the Bar presents an issue on which we find few guide lines. Petitioner's admission to the Bar in 1941 presumes certification by the State Board of Law Examiners that he then possessed the requisite qualifications. No evidence was presented suggesting a lack of competence during the period when he was a member of the Bar from 1941 until 1955. Neither the Maryland Rules nor the statute prescribing the duties of the State Board of Law Examiners provide for reexamination of an applicant for reinstatement. It is difficult to distinguish Petitioner's position from that of an attorney who once having been ad-

mitted to the Bar devotes himself to other pursuits for an extended period of time, such as military service, and after the passage of many years undertakes an active practice. Petitioner in his testimony outlined his activity in certain areas of criminal correctional law and his intention to become a volunteer intern with the Legal Aid Bureau of Baltimore, Inc. We believe that Petitioner exhibits a sound and responsible attitude by recognizing the need for refreshing his professional skills and by proposing a course by which he may accomplish this.

"We are mindful that every attorney is bound by Maryland Rule 1230 to conform to the Code of Professional Responsibility of the American Bar Association. Canon EC6-1 provides in part that an attorney * * * should accept employment only in matters which he is or intends to become competent to handle.

"We are persuaded that Petitioner will abide by the requirements of this Canon."

The testimony offered by Braverman and by the numerous witnesses on his behalf in support of the recitations made in his petition, and accompanying affidavit, plainly justified the findings of the three-judge panel that Braverman's present character is of a high order, that his conduct during the 18 years since his disbarment has been exemplary, that he disassociated himself from the Communist Party when he was released from prison in 1955 and never renewed his membership, that his activities and pursuits over the past 18 years have adequately demonstrated his reformation, and that he is presently competent to practice law. The more fundamental consideration, however, involves the nature and degree of Braverman's original misconduct and the circumstances attending the offense. See *In re Stump*, 272 Ky. 593, 114 S.W.2d 1094 (1938), cited with approval in *Meyerson*.

As heretofore indicated, Braverman was convicted of conspiracy to violate § 2 of the Smith Act by knowingly and wilfully advocating and teaching the duty and necessity of the violent overthrow of the United States Government and organizing the Communist Party of the United States to teach and advocate such overthrow, with intent to bring about this result as speedily as circumstances would permit. In affirming Braverman's conviction, the court in *Frankfeld v. United States, supra,* found no merit in the defendants' contention that the trial judge submitted the case to the jury in such way as to permit the jury to convict them of conspiracy on the basis of mere membership in the Communist Party, without knowledge on their part of any criminal purpose in which the Party was engaged. The *Frankfeld* court held that the evidence adduced at the trial was sufficient to show that the Communist Party was engaged in a conspiracy, the object of which was the violent overthrow of the government. It found that there was legally sufficient evidence that Braverman, who had " . . . served as a member of the District Committee of the party, had been a candidate for chairman of one of its meetings, had served as its attorney, was a member of its 'white collar club' and had conducted classes for it in his home . . . ," had joined that conspiracy with knowledge of its unlawful purposes.

Prior to the court's decision in *Frankfeld,* the constitutionality of the Smith Act had been upheld by the Supreme Court in *Dennis v. United States,* 341 U. S. 494, 71 S. Ct. 857, 95 L.Ed. 1137 (1951). In that case, the Supreme Court concluded that the defendants' conspiracy to organize the Communist Party to teach and advocate the violent overthrow of the government in violation of the Smith Act presented a "clear and present danger" of such an overthrow. The court approved the instructions given by the trial judge to the jury requiring that, before convictions could be returned, the jury had to find that each defendant had the specific intent to overthrow the government by force or violence as soon as circumstances would permit. The Court stated that since the Act was aimed at advocacy and not mere discussion, it did not prohibit academic discussions

of Marxism-Leninism. It was not clear from *Dennis*, however, that the Act proscribed only advocacy of action, and not advocacy of the abstract doctrine of forcible overthrow.

Six years after its decision in *Dennis* (and five years after *Frankfeld*), the Supreme Court, in *Yates v. United States*, 354 U. S. 298, 77 S. Ct. 1064, 1 L.Ed.2d 1356 (1957), rejected the government's theory that the defendants' complicity in a conspiracy to teach and advocate the violent overthrow of the government could be shown solely by their active identification with the Party's affairs. There, the Court stated that the record did not support a finding of illegal advocacy by the Party and that apart from such inadequacy " . . . it is difficult to perceive how the requisite specific intent to accomplish such overthrow could be deemed proved by a showing of mere membership or the holding of office in the Communist Party." 354 U. S. at 331. In *Scales v. United States*, 367 U. S. 203, 81 S. Ct. 1469, 6 L.Ed.2d 782 (1961), the Court construed the "membership clause" of the Smith Act which prohibited membership in an organization advocating the forceful overthrow of the government. It held that a defendant's active membership in an organization which advocated such overthrow in the sense of "advocacy of action," and his knowledge of that illegal advocacy, was not constitutionally sufficient to convict him of the offense in the absence of a showing of specific intent to overthrow the government by force and violence as soon as circumstances would permit. The Court stated that while all knowing association with a "technical conspiracy" may properly be the subject of criminal proscription, a similar prohibition of all knowing membership in a "quasi-political" organization would pose a real danger to legitimate political expression. Thus the Court held that a finding of such specific intent was necessary for conviction to ensure that " . . . [T]he member for whom the organization is a vehicle for the advancement of legitimate aims and policies does not fall within the ban of the statute . . . ." 367 U. S. at 229.

It is clear then that the decisions of the Supreme Court since *Dennis* and *Frankfeld* have evidenced a growing

concern for the protection of First Amendment rights, and have placed strict requirements upon the application of statutes proscribing activity involving elements of speech and association. See, e.g., *Law Students Civil Rights Research Council v. Wadmond,* 401 U. S. 154, 91 S. Ct. 720, 27 L. Ed. 2d 749 (1971); *United States v. Robel,* 389 U. S. 258, 88 S. Ct. 419, 19 L.Ed.2d 508 (1967); *Keyishian v. Board of Regents,* 385 U. S. 589, 87 S. Ct. 675, 17 L.Ed.2d 629 (1967); *Elfbrandt v. Russell,* 384 U. S. 11, 86 S. Ct. 1238, 16 L.Ed.2d 321 (1966). We agree with the Maryland State Bar Association that interpretations of the First Amendment now prevailing require that the government show more to obtain a conviction under the Smith Act than was necessary at the time of the *Frankfeld* decision. Braverman's conviction was based essentially upon the same theory as that advanced by the government, but rejected in *Yates* — that a defendant's participation in a conspiracy to violate the Smith Act could be shown by his active membership in the Communist Party. Although the jury instructions approved in *Frankfeld* were quite broad, and appear to meet the requirements imposed by subsequent cases, *i.e.,* that advocacy of "action" is proscribed and that advocacy of an "abstract doctrine" of forcible overthrow is not; that the defendants must be "active members" with knowledge of the party's illegal purpose; and that each defendant must have the specific intent to overthrow the government by force and violence as speedily as circumstances would permit — a serious question exists whether the evidence adduced against Braverman, apparently adequate to sustain his conviction under *Dennis,* would have been legally sufficient to support his conviction under the standards laid down in *Yates* and *Scales.* In finding the evidence legally sufficient to establish Braverman's connection with the conspiracy engaged in by the Communist Party, and to support his conviction, the *Frankfeld* court stated:

> "They [the defendants] were shown to be officers and teachers of the party occupying such positions with respect to its activities that the jury could well conclude that they necessarily had knowledge of the

criminal purposes in which it was engaged . . . It is well settled that persons who join a conspiracy with knowledge of its unlawful purposes make themselves parties thereto and are equally guilty with those who originated it." 198 F. 2d at 686.

It was precisely this application of the "well established" prerequisites to a finding of complicity in a "technical conspiracy" that the Supreme Court refused to follow in *Scales* with respect to "quasi-political" organizations that have both legal and illegal aims. It required that a defendant have the specific intent to forcibly overthrow the government. Although *Frankfeld* followed *Dennis* in charging that the jury must find that the defendants had such an intent, it was not until *Yates* that the Court enunciated its view that the requisite specific intent could not be shown by "mere membership or the holding of office in the Communist Party." Despite the court's statement in *Frankfeld* that the case against Braverman "was not one of mere membership" in the Party depending upon "guilt by association," it nevertheless found the evidence legally sufficient to support his conviction upon a showing that Braverman was an active member of the Party with knowledge of its illegal advocacy. Braverman's activities, as summarized by the court in *Frankfeld* appear to reflect activity not amounting to "advocacy of action" under *Yates* and *Scales*.[1] Thus, it would seem apparent that Braverman's

---

1. In *Scales* the court interpreted its earlier decision in *Yates*. It held that *Yates* made it clear that the following category of evidence was not in itself sufficient to show illegal advocacy: the teaching of Marxism-Leninism and the connected use of Marxist "classics" as text books; the official general resolutions and pronouncements of the Party at past conventions; dissemination of the Party's general literature, including the standard outlines on Marxism; the Party's history and organizational structure; the secrecy of meetings and the clandestine nature of the Party generally; statements by officials evidencing sympathy for and alliance with the USSR. The Court also stated that *Yates* indicated at least two patterns which were sufficient to show illegal advocacy: 1) The teaching of forceful overthrow, accompanied by directions as to the type of illegal action which must be taken when the time for revolution is reached; 2) and the teaching of forceful overthrow, accompanied by a contemporary though legal course of conduct for the specific purpose of rendering effective the later illegal activity which is advocated.

activities with the Communist Party did not mount up to the requisite showing of "clear proof" of his specific intent to "accomplish the aims of the organization by resort to violence" required by subsequent decisions. See *Scales*, 367 U. S. at 229. We also note, as suggested by the Maryland State Bar Association, that the fact that all enforcement of the Smith Act has ceased indicates that convictions obtained under that Act, including Braverman's, were related to "a particular time and condition" and as such his disbarment was in large measure a product of those times and conditions and must be viewed "in terms of present realities."

We agree with the conclusion of the three-judge panel that "developments in the law have necessitated a change in judicial and prosecutorial attitude" and that a consideration of the nature and circumstances of Braverman's original misconduct reveals that his reinstatement would not be prejudicial to the administration of justice. In so concluding, we are considerably influenced by the fact that the Maryland State Bar Association, acting in its capacity as "the formal [state-wide] entity of 'the [legal] profession as a whole' . . . [having a] proper, direct and pervading interest" in disbarment and reinstatement proceedings, *Maryland State Bar Association v. Boone, supra* at 425, has recommended Braverman's reinstatement, fully cognizant of its duty "to uphold the highest standards of professional conduct and to protect the public from imposition by the unfit . . . practitioner," *In the Matter of Lombard,* 242 Md. 202, 207, 218 A. 2d 208, 211 (1966). In its brief, the State Bar Association states that its recommendation is advanced "with complete understanding that Braverman was duly and fairly convicted of a Smith Act violation in 1952 . . . that all remedies by way of appeal were exhausted . . . [and that the] conviction is conclusive proof of his guilt [Rule BV4 f 1]." The Association states that while Braverman's conviction was an adequate ground *vel non* for his disbarment, "the coalescence in the 1950's of Braverman's repudiation of communism and the government's abandonment of the Smith Act indicate that the 'time and conditions' may now

be ripe for his reinstatement." The Association asserts that "it is only unique and unusual circumstances" which has prompted it to support the reinstatement petition. Although steadfastly maintaining that force and violence have always been "abhorrent" to his personal creed, Braverman acknowledges that he was convicted of belonging to the Communist Party prior to 1951 and being part of the conspiracy which was ascribed to such membership. But he urges that the "underlying characteristic" which resulted in his "being found guilty of moral turpitude has been cured."

We noted in *Boone* (at footnote 1, p. 435) that consistent with the standards for reinstatement to practice law set forth in *Meyerson,* Drinker, *Legal Ethics,* pp. 49-50, states that while it was always possible that a disbarred lawyer could be reinstated, "this, . . . should almost never occur except where the court concludes that the disbarment was erroneous . . . [f]or a lawyer who has been found guilty of an act warranting disbarment to be reinstated justly creates an impression on the public which is very bad for the reputation of the bar, the conclusion being that this is because of friendship, pity, or political influence. . . ." Of course, as we pointed out in *Meyerson,* disbarment of an attorney does not operate as a permanent disability. Indeed, Maryland Rule BV9 b (adopted after the decision in *Boone*), which authorizes filing of petitions for reinstatement, requires that "facts [be set forth] showing that the Petitioner is rehabilitated and is otherwise entitled to the relief sought." That the burden of establishing the averments of the petition is a heavy one is manifest from the provisions of Rule BV9 d 3 — "clear and convincing proof" must be shown by the Petitioner to support his petition for reinstatement. See also Maryland Code (1968 Repl. Vol.), Article 10, Section 22. We think Braverman has, in the eighteen years since his original disbarment, demonstrated his fitness to be reinstated to practice law by clear and convincing proof in accordance with the basic standards governing reinstatement petitions set forth in *Meyerson* and *Boone*; accordingly, we shall sign an order directing that Maurice L. Braverman be readmitted as a member of the

Bar in good standing upon his subscribing, in open court, to the oath of attorneys required by Code, Article 10, § 10.

## O R D E R

The panel of Judges designated in the Order of this Court dated October 1, 1973, having recommended reinstatement of Maurice L. Braverman as a member of the Bar of Maryland, and a hearing having been held on said recommendation, it is, this 1st day of March, 1974, in accordance with the opinion of the Court filed this date, two Judges dissenting,

*ORDERED*, by the Court of Appeals of Maryland, that Maurice L. Braverman be, and he is hereby, reinstated as a member of the Bar of Maryland upon his subscribing, in open court, to the oath of attorneys required by Code, Article 10, sec. 10.

/s/ Robert C. Murphy

/s/ Frederick J. Singley, Jr.

/s/ J. Dudley Digges

/s/ Irving A. Levine

/s/ John C. Eldridge

Filed: March 1, 1974.

/s/ James H. Norris, Jr.

Clerk, Court of Appeals of Maryland

*Digges, J., concurring:*

I concur in the order of the Court that "Maurice L. Braverman, be . . . reinstated as a member of the Bar of Maryland . . . ." and with those portions of the majority opinion which conclude that Mr. Braverman has, as required by Maryland Rule BV9 b and d 3, factually demonstrated in these proceedings that he is now "rehabilitated and is otherwise entitled to the relief sought." However, I cannot subscribe to that portion of the opinion which questions the integrity of the petitioner's criminal conviction in the United States District Court for the District of Maryland or in the majority's conclusion that it is necessary to attempt to explain it away. As I read Rules BV4 f 1 and BV9 d 4, they expressly prohibit such a collateral attack in these proceedings. These rules in pertinent part provide:

> "The provisions of . . . Rule BV4 (Hearing) . . . shall be applicable to proceedings instituted pursuant to this Rule [(Reinstatement)]." BV9 d 4.

> "In a hearing of charges pursuant to this Rule, a final judgment by a judicial tribunal in another proceeding convicting an attorney of a crime shall be conclusive proof of the guilt of the attorney of such crime. . . . A final adjudication by a judicial tribunal in a disciplinary proceeding that an attorney has been guilty of misconduct shall be considered as conclusive proof of such misconduct in the hearing of charges pursuant to this Rule." BV4 f 1.

The rule which governs reinstatement (Rule BV9) directs only that we be convinced Mr. Braverman has demonstrated that, despite his conviction and subsequent disbarment, he is now morally and intellectually qualified to re-enter the practice of law in this State. In my view, the establishment of petitioner's guilt in a trial which he and the two Bar Associations agree was fairly conducted and which has weathered appellate attack must, in the absence of prior nullification by appropriate post conviction procedure or

executive clemency, be accepted as valid and fully binding on this Court now.

*Smith, J., dissenting:*

My heart aches for any individual, and more particularly for his family, who has completed the long and arduous trek to his goal of being a member of one of the three anciently recognized learned professions, in this instance the law, and then finds himself ousted from that profession as a result of his misconduct. Moreover, I believe absolutely in a doctrine of forgiveness and brotherly love. Thus, the easy thing to do would be to vote for reinstatement of Mr. Braverman as a member of the Bar of this Court. One should never cast a vote in this Court upon the basis of what he thinks press reaction would be.[1] Nevertheless, I am fully conscious of the fact that one segment, at least, of the metropolitian press will fully approve Mr. Braverman's reinstatement. However, a vote by me to reinstate would not be in accord with my understanding of what this and other courts have said as to our responsibilities in passing upon an application for reinstatement to the bar.

In *In re Meyerson,* 190 Md. 671, 59 A. 2d 489 (1948), Judge (later Chief Judge) Markell was the spokesman for the Court. Early in that opinion he said:

> " 'The question is, whether, after the conduct of this man, it is proper that he should continue a member of a profession which should stand free from all suspicion. * * * *It is not by way of punishment;* but the court, in such cases, exercise their discretion whether a man whom they have formerly admitted is a proper person to be

---

[1]. An attempt to influence our decision in a given matter other than through the regular, established processes of oral argument and printed brief would be roundly condemned by the press, and justifiably so. Nevertheless, there has been more than one instance in recent months of an editorial suggesting what our position should be on a given matter. I am sure that if the writers had stopped to think about the inherent impropriety of such editorials, the editorials would not have appeared. Moreover, I have never seen such editorial suggestions to the Supreme Court of the United States or to a United States Court of Appeals.

continued on the roll or not.' *Ex parte Brownsall,* 1778, 2 Cowp. 829 (Lord Mansfield), quoted in *Ex parte Wall,* 107 U. S. 265, 273, 2 S. Ct. 569, 27 L. Ed. 552, and in *Rheb v. Bar Association of Baltimore,* 186 Md. [200] at page 205, 46 A. 2d 289, 291 [(1946)]. The requirement that an applicant for admission be of 'good moral character', and the fact that of the six statutory grounds of disbarment only the first two (tautological) grounds are limited to professional, as distinguished from personal offenses, illustrate the breadth of Lord Mansfield's statement and of the later authorities applying various statutory provisions which are elaborations of his brief statement." *Id.* at 675-76. (Emphasis added.)

The Lord Mansfield Rule was quoted with approval by Judge Digges for this Court in the recent case of *Balliet v. Balto. Co. Bar Ass'n,* 259 Md. 474, 478, 270 A. 2d 465 (1970).

In considering an application for reinstatement, we must remember that, as it was put in *In re Cannon,* 206 Wis. 374, 240 N. W. 441 (1932):

"The relation of the bar to the courts is a peculiar and intimate relationship. The bar is an attaché of the courts. The quality of justice dispensed by the courts depends in no small degree upon the integrity of its bar. An unfaithful bar may easily bring scandal and reproach to the administration of justice and bring the courts themselves into disrepute." *Id.* at 383.

In *Meyerson,* Judge Markell also said for the Court:

" 'A subsequent petition for admission to the bar involves a new inquiry as to whether, in the interval following the rendering of the judgment of removal, the petitioner has become a proper person to hold such office.' *In re Keenan, Petitioner,* 310 Mass. [166] at page 170, 37 N.E.2d at page 519. Such an inquiry is directed to the facts of the particular case, but seems to be approached in a

somewhat different attitude in different jurisdictions. *In re Stump,* 272 Ky. 593, 597, 114 S.W.2d 1094, 1096, the court classified the many decisions as establishing three rules, a 'lax rule', a 'strict rule', and a 'reasonable middle rule.' It would serve no useful purpose to review the multitude of cases in different jurisdictions. Some cases, we think, do reflect a 'lax rule' which is not consistent with the principles, regarding admission and disbarment, shortly stated by Lord Mansfield, expanded in the Maryland statutes and applied in rules of this court and in decisions of this court and the Supreme Court. As disbarment is not punishment, likewise we think due regard for the administration of justice does not permit disbarment and reinstatement to be made mere adjuncts to reform schools and the parole system. The authorities that seem to us the best considered take a different view, which is consistent with the principles recognized in Maryland.

"*In Matter of Kaufmann,* 245 N.Y. 423, 427, 157 N.E. 730, 731, it was held that after a lawyer, automatically disbarred upon conviction of a felony (in that case, conspiracy against the United States), has been pardoned, he may, if he can, upon application for reinstatement, prove his innocence of the crime of which he was convicted. Chief Judge Cardozo said: 'Precedents cited to the contrary hold no more than this, that reinstatement will *not* follow automatically from pardon without more. *People ex rel. Johnson v. George,* 186 Ill. 122, 57 N.E. 804. There must be convincing proof of innocence before pardon will restore to the fellowship of the bar. Even innocence of crime will not suffice if there has been a failure to live up to the standards of morality and honor. Pardon does no more than open the door to an inquiry that would otherwise be barred. That much, however, it does.' 245 N.Y. at page 430, 157 N.E. at page 733. It was apparently undisputed that nothing short of

innocence of the particular crime involved in that case would justify reinstatement. Attorney General (later Chief Justice) Stone's recommendation of pardon to the President was based on belief in innocence. In the same case Judge Cardozo also said: 'No doubt the attorney seeking reinstatement has the burden of satisfying the court of his fitness to be restored to so honorable a fellowship. For the welfare and repute of the profession the order of disbarment stands until the presumption of its correctness has been persuasively rebutted.' 245 N.Y. at pages 428, 429, 157 N.E. at page 732. The Supreme Judicial Court of Massachusetts has recently said: 'A judgment of removal of a person from his office of attorney at law does not have the effect merely of removing him. It amounts to an adjudication of the facts upon which the removal was based. While the judgment remains unreversed the adjudication of facts stands against the person removed. It is evidence against him upon his subsequent petition for admission to the bar. [Citing cases.] It is conclusive of his lack of moral character at the time of his removal from office. And it continues to be evidence against him with respect to lack of moral character at later times in accordance with the principle that "a state of things once proved to exist may generally be found to continue." [Citing case.] Whatever the offense for which a judgment of disbarment was entered, the person disbarred has a heavy burden on a subsequent petition for admission to the bar to overcome by evidence the weight of the facts adjudicated by such judgment and to establish affirmatively that since his disbarment he has become "a person proper to be held out by the court to the public as trustworthy." ' *Matter of Keenan,* 313 Mass. 186, 219, 47 N.E.2d 12, 32. The Supreme Court of Louisiana has said: 'It may well be assumed, therefore, that the Court has the inherent power, under such rules as the Court may deem

proper, to revoke the decree of disbarment and reinstate the attorney in his license to practice law. But the Court would not be disposed to exercise that power, no matter how sympathetic the members of the Court might be, unless perhaps, on being convinced that an error was committed, or an injustice done, in rendering the decree of disbarment. There is no such showing in this case.' *In re Wolff,* 173 La. 257, 136 So. 583, 584." *Id.* at 677-79.

This exact language from *Meyerson* was quoted by Chief Judge Hammond for the Court in *Maryland St. Bar Ass'n v. Boone,* 255 Md. 420, 432-35, 258 A. 2d 438 (1969).

In *Boone,* Judge Hammond also said:

"We said in *Rheb v. Bar Association,* 186 Md. 200, 205, and *In the Matter of Lombard,* 242 Md. 202, 207, that '[i]n the last analysis the duty rests upon the courts *and the profession as a whole,* to uphold the highest standards of professional conduct and to protect the public from imposition by the unfit or unscrupulous practitioner.' (Emphasis added.)" *Id.* at 425.

The accepted authority on the matter of legal ethics is H. Drinker, *Legal Ethics* (1953). *See* A. Tate & W. Hebert, *Treatises for Judges: A Selected Bibliography* 38 (1971). Judge Hammond in a footnote at page 435 of *Boone* quoted the following language from *Drinker:*

"While it is, of course, always possible that a disbarred lawyer may be reinstated, this, it is believed, should almost never occur except where the court concludes that the disbarment was erroneous. For a lawyer who has been found guilty of an act warranting disbarment to be reinstated justly creates an impression on the public which is very bad for the reputation of the bar, the conclusion being that this is because of friendship, pity, or political influence; which is not

infrequently the case. In *Matter of Shepard* [35 Cal. App. 492, 501 (1917)], the court said: 'When he has been once disbarred, a mistaken charity should not restore him to his position.' "

\* \* \*

"While the courts have repeatedly said that it should require much stronger proof of good character to restore a disbarred lawyer than that required on his admission, nevertheless, lawyers are continually being reinstated, after disbarment, for conduct which any character committee would have unquestionably held to preclude their original admission. Instances of this kind, often manifestly unjustified, are most injurious to the reputation of the bar in the eyes of the public." *Id.* at 49-50.

In *In re Petition of Morrison,* 45 S. D. 123, 186 N. W. 556 (1922), the court said relative to reinstatement:

"[I]f he petitions for reinstatement, the burden is upon him to establish by satisfactory evidence, either that the court erred in its judgment of disbarment, or that he has undergone such moral change as to render him a fit person to enjoy the trust and confidence once forfeited. A court should be slow to disbar, *but it should be even slower to reinstate;* it should endeavor to make certain that it does not again put into the hands of an unworthy petitioner that almost unlimited opportunity to inflict wrongs upon society possessed by a practicing lawyer." *Id.* at 126. (Emphasis added.)

That court was faced with many endorsements of reinstatement, as are we. It said on that subject:

"Some twenty or more think petitioner has suffered sufficient *punishment* — apparently forgetting that disbarment is not imposed as a punishment, but as a necessary means of protection to society, and that, as long as society may need protection, this court has no right to deny such

protection merely because an individual may suffer from not being allowed to hold the power to injure society. Many urge that the *punishment* he has suffered will deter him from future wrongdoing, forgetting that it is not fear as to the consequences of wrongdoing that qualifies one for admission to the bar, but rather an innate desire and intent to follow the right course." *Id.* at 129-30. (Emphasis in original.)

It is obvious that Braverman and some of his supporters in the public do not comprehend the true purpose of disbarment since a footnote in his brief refers to a story in a metropolitan daily in which he is called "A McCarthy Era Casualty Who Is Still Being Punished." As has already been pointed out, disbarment is not for purposes of punishment. It is to protect the public from one who has shown by his actions that he is unworthy of the trust and confidence reposed in him when he was admitted to the bar. Moreover, it is important to remember that the Smith Act, which Braverman was found to have violated, was passed in 1940 during the second term of Franklin Delano Roosevelt, a number of years prior to the appearance of Senator Joseph McCarthy upon the national political scene.

One of the usual prerequisites for reinstatement of a disbarred lawyer is remorse for his wrongdoing. For instance, in *In re Stump*, 272 Ky. 593, 114 S.W.2d 1094 (1938), cited by Judge Markell for the Court in *Meyerson*, the court said:

"[W]hile it has been said that the recreant brother must show regret or repentance, we are not willing to say that a man must humble himself or be required to confess guilt of what may be a criminal offense. *But he should at least manifest a sense of wrongdoing, and in the language of the Scriptures, 'bring forth, therefore, fruits meet for repentance.' By his subsequent life and conduct he must have demonstrated his reformation;* for, men do not 'gather grapes of thorns, or figs of thistles,' and persistency in wrongdoing suggested to the prophet

the unchangeable colors of the leopard's spots. The ultimate and decisive question is always whether the applicant is now of good moral character and is a fit and proper person to be reintrusted with the confidences and privileges of an attorney at law. This question has a broader significance than its purely personal aspect. From time immemorial lawyers have in a peculiar sense been regarded as officers of the court. It is a lawyer's obligation to participate in upholding the integrity, dignity, and purity of the courts. He owes a definite responsibility to the public in the proper administration of justice. It is of utmost importance that the honor and integrity of the legal profession should be preserved and that the lives of its members be without reproach. The malpractice of one reflects dishonor not only upon his brethren, but upon the courts themselves, and creates among the people a distrust of the courts and the bar. Therefore, one proven to have violated those conditions of good behavior and professional integrity annexed to the granting of the privilege of practicing law, in applying for restoration, has the burden of overcoming by persuasive evidence the former adverse judgment on his qualification. In short, *if the disbarred attorney can prove after the expiration of a reasonable length of time that he appreciates the significance of his derelictions;* has lived a consistent life of probity and integrity, and shows that he possesses that good character necessary to guarantee uprightness and honor in his professional dealings and the faithful discharge of his duties as a lawyer, and therefore is worthy to be restored, the court will so order. Thornton on Attorneys at Law, sec. 902; Walker v. Commonwealth, 71 Ky. 86, 8 Bush 86; In re Snodgrass, 166 Okl. 156, 26 P. (2d) 756; In re Bruener, 178 Wash. 165, 34 P. (2d) 437; Burns v. State, Tex. Civ. App., 76 S.W. (2d) 172; In re Egan, 52 S. D. 394, 218 N.W. 1; In re O'Connell, 199 Cal.

538, 250 P. 390, 48 A.L.R. 1232; Kepler v. State Bar, 216 Cal. 52, 13 P. (2d) 509; In re Clark, 128 App. Div. 348, 112 N.Y.S. 777; In re Hawkins, 4 Boyce, Del., 200, 87 A. 243; In re Thatcher, 83 Ohio St. 246, 93 N.E. 895, Ann. Cas. 1912A, 810; Ex parte Marshall, [165 Miss. 523, 147 So. 791]." *Id.* at 598-99. (Emphasis added.)

This Court has not had the precise point before it, insofar as I can find, probably because prior to the adoption of the current rules in 1970 an application for reinstatement was addressed to the *nisi prius* court which had disbarred the petitioner. This Court was involved only if there were an appeal by the applicant. No appeal existed from an order directing reinstatement. *Boone, supra.* I find it significant, however, that in the disbarment case of *Fellner v. Bar Ass'n,* 213 Md. 243, 247, 131 A. 2d 729 (1957), which did reach this Court on appeal, Judge (later Chief Judge) Henderson said for the Court as part of an opinion that sustained an order for disbarment, "It is not without significance, as bearing upon his moral fitness, that he has never yet admitted that he did wrong."

Do we find evidence of remorse here? The panel of judges which heard this case said:

"As to Petitioner's reformation, the Baltimore Bar Association raises the philosophical question of how Petitioner has proven his reformation when he refuses to recognize the existence of any misconduct from which to reform. Since Petitioner is adamant in his belief in his innocence, he is consistent in not expressing any repentance."

The panel went on to recognize "the intellectual honesty of his position." Nevertheless, there is no repentance.

I am shocked, to put it mildly, that the Maryland State Bar Association would take the position, as expressed in the opinion of the panel which heard this case, "that Petitioner's misconduct which resulted in his conviction was largely political in nature and should be viewed in the light of present realities." The present realities to which allusion

was made were expressed in the brief as amicus curiae filed with us by that association last fall when the matter was first before us. It said:

> "Over the years it has become increasingly apparent that the advocacy and teaching for which Braverman was convicted and disbarred during the 1950's was of a kind which, if reconsidered today, would fall within the expanded protection of the First Amendment."

It was contended to us then and again when this matter was argued after the report of the panel of trial judges that the Supreme Court has outlawed prosecutions such as Braverman's with citations to *Brandenburg v. Ohio*, 395 U. S. 444, 89 S. Ct. 1827, 23 L.Ed.2d 430 (1969), and *Yates v. United States*, 354 U. S. 298, 77 S. Ct. 1064, 1 L.Ed.2d 1356 (1957). At the last oral argument Braverman added to his list the recently decided case of *Communist Party of Indiana v. Whitcomb*, 414 U. S. 441, 94 S. Ct. 656, 38 L.Ed.2d 635 (1974). Not one of these cases supports any such proposition. *Whitcomb* involved the right of the Communist Party to appear on the Indiana ballot without first filing affidavits of its officers that it did not advocate the overthrow of local, state or national government by force or violence. There, Mr. Justice Brennan said for the Court:

> "We most recently summarized the constitutional principles that have evolved in this area in *Brandenburg v. Ohio*, 395 U.S. 444 (1969). We expressly overruled the earlier holding of *Whitney v. California*, 274 U.S. 357 (1927), that 'without more, "advocating" violent means to effect political and economic change involves such danger to the security of the State that the State may outlaw it.' *Id.*, 447. For, we said:
>
>> '[L]ater decisions have fashioned the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such

advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.[2] As we said in *Noto v. United States*, 367 U.S. 290, 297-298 (1961), "the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." . . . A statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments. It sweeps within its condemnation speech which our Constitution has immunized from governmental control. Cf. *Yates v. United States*, 354 U.S. 298 (1957); . . .' *Id.*, 447-448." *Id.* at 447-48. 94 S. Ct. at 661.

*Brandenburg* involved **a** prosecution under an Ohio criminal syndicalism statute. The convictions were reversed because, as the Court put it:

"Neither the indictment nor the trial judge's instructions to the jury in any way refined the statute's bald definition of the crime in terms of mere advocacy not distinguished from incitement to imminent lawless action." *Id.* at 448-49.

The footnote in *Brandenburg* in that portion quoted in *Whitcomb* said:

"2. It was on the theory that the Smith Act, 54 Stat. 670, 18 U.S.C. § 2385, embodied such a principle and that it had been applied only in conformity with it that this Court sustained the Act's constitutionality. *Dennis v. United States*, 341 U.S. 494 (1951). That this was the basis for *Dennis* was emphasized in *Yates v. United States*, 354 U.S. 298, 320-324 (1957), in which the Court overturned convictions for advocacy of the forcible overthrow of the Government under the Smith Act, *because*

> *the trial judge's instructions had allowed conviction for mere advocacy, unrelated to its tendency to produce forcible action." Id.* at 447-48. (Emphasis added.)

*Yates* was a Smith Act case. Mr. Justice Harlan there said for the Court, after reviewing the trial court's instructions and the claim that yet other instructions should have been given:

> "The distinction between advocacy of abstract doctrine and advocacy directed at promoting unlawful action is one that has been consistently recognized in the opinions of this Court, beginning with *Fox v. Washington,* 236 U.S. 273, and *Schenck v. United States,* 249 U.S. 47. This distinction was heavily underscored in *Gitlow v. New York,* 268 U.S. 652, in which the statute involved was nearly identical with the one now before us, and where the Court, despite the narrow view there taken of the First Amendment, said:
>
>> 'The statute does not penalize the utterance or publication of abstract "doctrine" or academic discussion having no quality of incitement to any concrete action. . . . It is not the abstract "doctrine" of overthrowing organized government by unlawful means which is denounced by the statute, but the advocacy of action for the accomplishment of that purpose. . . . This [Manifesto] . . . is [in] the language of direct incitement. . . . That the jury were warranted in finding that the Manifesto advocated not merely the abstract doctrine of overthrowing organized government by force, violence and unlawful means, but action to that end, is clear. . . . That utterances inciting to the overthrow of organized government by unlawful means, present a sufficient danger of substantive evil to bring their punishment within the range òf

legislative discretion, is clear.' *Id.*, at 664-669."
*Id.* at 318-19.

\* \* \*

"The Government's reliance on this Court's decision in *Dennis* is misplaced. The jury instructions which were refused here were given there, and were referred to by this Court as requiring 'the jury to find the facts *essential* to establish the substantive crime.' 341 U.S., at 512 (emphasis added). It is true that at one point in the late Chief Justice's opinion it is stated that the Smith Act 'is directed at advocacy, not discussion,' *id.*, at 502, but it is clear that the reference was to advocacy of action, not ideas, for in the very next sentence the opinion emphasizes that the jury was properly instructed that there could be no conviction for 'advocacy in the realm of ideas.' The two concurring opinions in that case likewise emphasize the distinction with which we are concerned. *Id.*, at 518, 534, 536, 545, 546, 547, 571, 572." *Id.* at 320.

In *Yates*, the trial court had failed to give the *Dennis* instructions. In Braverman's case the *Dennis* instructions were given. In Braverman's brief there is a footnote to *Yates* with the comment that in that case "the Supreme Court ordered the acquittal of several officers of the Communist Party on the ground that 'none of them has engaged in or been associated with any but what appears to have been wholly lawful activities.' 354 at 330." We are not advised in the brief of the fact that the Court also said:

"On this basis we have concluded that the evidence against petitioners Connelly, Kusnitz, Richmond, Spector, and Steinberg is so clearly insufficient that their acquittal should be ordered, but that as to petitioners Carlson, Dobbs, Fox, Healey (Mrs. Connelly), Lambert, Lima, Schneiderman, Stack, and Yates, we would not be

justified in closing the way to their retrial. We proceed to the reasons for these conclusions." *Id.* at 328-29.

The comment is also made in Braverman's brief that "[t]he era of McCarthyism has subsided and the threat of unorthodox political beliefs no longer is so readily punished." As I shall demonstrate, Braverman was not punished for "unorthodox political beliefs." As the record makes plain, his activities went much further than just unorthodox political beliefs.

Braverman was tried in the United States District Court for the District of Maryland with Philip Frankfeld *et al.* His case on appeal was known as *Frankfeld v. United States,* 198 F.2d 679 (4th Cir. 1952). There, Chief Judge Parker said for the court, which included Maryland's distinguished Morris A. Soper:

"The defendants contend here, just as did the defendants in the Dennis case, that the use of force and violence is no part of the program of the party and presented evidence to that effect; but the question thus presented was one for the jury to decide and its finding in accordance with the contention of the government was amply supported by the testimony of witnesses as well as by the documentary evidence adduced." *Id.* at 686.

The jury which convicted Braverman was presided over by the late W. Calvin Chesnut, a truly distinguished jurist. Accordingly, it was he who charged the jury. I find it of interest in the context of this application that Chief Judge Parker said:

"Defendants contend that the court submitted the case in such way as to permit the jury to convict them of conspiracy on the basis of mere membership in the Communist party, without knowledge on their part of any criminal purpose in which the party was engaged. There is no basis for any such contention. On the contrary the jury were

expressly instructed that no one of the defendants could be convicted unless the jury should find guilty knowledge and intent on his part. Thus the judge, in the beginning of his charge, after defining the crime of conspiracy as charged in the indictment, told the jury explicitly:

'* * * unless you do find affirmatively beyond a reasonable doubt with respect to each of the defendants separately and respectively considered that they did conspire either among themselves or with others named in the indictment who are not defendants, to commit one or more of the prohibited acts, you should find a verdict of not guilty for such defendant who did not so conspire. And in the case of any one of the defendants I charge you that you should find that defendant not guilty unless you find that in so conspiring with another or others that he did so wilfully, knowingly and with the intent mentioned.' "

\* \* \*

*"The judge made it clear that the Communist Party could teach the abstract doctrine of overthrowing the government by force so long as it did not advocate action to that effect, saying:*

'And in this connection I further instruct you that the Smith Act is not aimed against the teaching of the mere abstract doctrine of overthrowing the government or the mere teaching of the historical doctrine of Marxism or Leninism. The Communist Party and its members are entitled to do this so long as their teaching does not go to the extent of advocating action for the accomplishment of a violent revolution by language reasonably and ordinarily calculated to incite persons to such action.'

"With respect to the second main question in the case as theretofore defined, the connection of the defendants with the conspiracy if one had been proven, he charged the jury as follows:

'In passing on this second main question, you must consider the evidence with respect to the several defendants separately. The Government is not entitled to obtain a conviction against any one of the six defendants unless it establishes beyond a reasonable doubt, first, that such defendant joined the conspiracy by becoming an active member of the Communist Party knowing its aims and objectives as contended by the Government, and personally intending in accordance with said objectives and as an active member or officer or official of said Party to knowingly and wilfully advance or advocate its principles of teaching the duty or necessity of overthrowing the Government as speedily as circumstances would permit, or with such intent to circulate and distribute literature which so teaches, or to organize or help to organize groups or assemblies of persons who so teach or advocate or encourage the overthrow or destruction of the government. You should not convict any of the defendants unless you find that they had this specific intent and were wilful and knowing in what they were doing. The Government must also prove in this connection that with such knowledge, purpose, and intent a defendant became and was or continued to be a member of such a conspiracy within the period of three years before the finding of the indictment.'

"After stating the government's contentions with respect to each defendant, he said:

'With respect to each defendant, the

Government has the burden of proving that he or she joined in and participated in such conspiracy knowingly and wilfully and that such defendant entertained the specific intention to teach or advocate the duty or necessity of overthrowing or destroying the government of the United States by force and violence and that he or she intended to teach or advocate such doctrine or to organize groups for such purpose *with the specific intent or purpose of bringing about such overthrow as speedily as circumstances would permit.* The Government must establish this beyond a reasonable doubt.'

*"In the light of these instructions, there is no ground whatever for the contention strenuously made by defendants that the jury were allowed to convict on the basis of mere party membership or guilt by association." Id.* at 687-88. (Emphasis added.)

In *In re Braverman,* 148 F. Supp. 56 (D. Md. 1957), the court was concerned with a disbarment action in that court. According to Chief Judge Thomsen's version, Braverman was then contending "that his trial and conviction revealed no misconduct that warrant[ed] his disbarment . . . ." Judge Thomsen quoted from *In re Isserman,* 345 U. S. 286, 73 S. Ct. 676, 97 L. Ed. 1013 (1953), *reversed on other grounds,* 348 U. S. 1, 75 S. Ct. 6, 99 L. Ed. 3 (1954). There, Chief Justice Vinson said:

"It is said that respondent has already been punished enough for his contempt and that to disbar him is excessive, vindictive punishment. Such an attitude misconceives the purpose of disbarment. There is no vested right in an individual to practice law. Rather there is a right in the Court to protect itself, and hence society, as an instrument of justice. That to the individual disbarred there is a loss of status is incidental to

the purpose of the Court and cannot deter the Court from its duty to strike from its rolls one who has engaged in conduct inconsistent with the standard expected of officers of the Court." *Id.* at 289.

The nature of Braverman's crime, in the sense of his responsibility as a member of the bar, has seemed to escape some, including the majority here. It did not escape Judges Thomsen and Watkins, who heard that matter in the United States District Court. Judge Thomsen there said for the court:

> "We cannot agree with respondent's contention that his trial and conviction revealed no misconduct that warrants his disbarment. *Not only was the crime of which he was convicted a felony, it involved moral turpitude; and it involved a violation of the first undertaking of the oath which respondent took when he was admitted to practice as an attorney of this court: 'I will support the Constitution of the United States.'* " *Id.* at 57. (Emphasis added.)

We have here an unpardoned felon who shows not the slightest remorse for his acts. A jury of his peers found that he had violated the Smith Act. Juries are presumed to follow the instructions given them. *Shotwell Manufacturing Co. v. United States,* 371 U. S. 341, 367, 83 S. Ct. 448, 9 L.Ed.2d 357 (1963), and *Carroll v. Fisher,* 145 Md. 32, 35, 125 A. 439 (1924). In my opinion the language of Judge Chesnut's charge in Braverman's case required the jury, in returning a guilty verdict, to also conclude that Braverman violated the oath taken by every lawyer in this State for more than 100 years. That oath as set forth in Code (1957) Art. 10, § 10 states in part:

> "I will bear true allegiance to the United States, and ... I will support, protect and defend the Constitution, laws and government thereof as the supreme law of the land ...."

An oath is a fundamental part of our judicial procedure.

To testify falsely under oath is perjury. To induce one to testify falsely under oath is subornation of perjury. Either crime strikes at the very fundamentals of our judicial system. I strongly suspect that my brethren of the majority would not deem eligible for reinstatement an unpardoned individual, previously convicted of perjury or subornation of perjury, who showed not the slightest remorse for his unlawful acts. They would be justified in saying, as it was put in a slightly different context in *State v. Cannon*, 199 Wis. 401, 404, 226 N. W. 385 (1929), "[T]he right of a lawyer to maintain his place at the bar must be determined by his conduct as a minister of justice." Braverman not only was convicted of a crime involving moral turpitude, he was shown to have acted contrary to the oath he took in this Court and the similar oath he took in the United States District Court for the District of Maryland. I see no difference between reinstating him and reinstating a convicted and unpardoned perjurer who shows not the slightest remorse for the crime he perpetrated. When one commits the crime of perjury one demonstrates that his oath to tell the truth means nothing to him. As I have pointed out, to find Braverman guilty of a violation of the Smith Act, the jury was obliged to conclude that Braverman committed acts which violated his oaths of loyalty to the United States, oaths taken when he was admitted to the bars of this Court and of the United States District Court for the District of Maryland. Therefore, by his acts he betrayed the trust and confidence resposed in him when he was originally admitted to practice in this Court. I am of the opinion that a person who demonstrates by his conduct that an oath means nothing to him, and who shows not the slightest repentance for his misbehavior, is not qualified to be an officer of this Court, as Braverman will be upon his reinstatement to the bar by the Court's action today. Therefore, I am strongly of the opinion that Braverman's petition should be rejected.

Judge Barnes reviewed this opinion and authorized me, prior to the effective date of his resignation from this Court, to say that he concurs in the views expressed in this opinion.